# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

| | |
|---|---|
| United States of America<br>v. | )<br>)<br>)   Case No.<br>)<br>)<br>)<br>) |
| Andres Giraldo | ) |
| *Defendant(s)* | |

**FILED**

OCT 0 3 2013

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

2:13 - MJ - 0 3 1 0    CKD

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___February 2011 to the present___ in the county of ___Sacramento___ in the ___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18  1349 | Conspiracy to Commit Mail Fraud |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
*Complainant's signature*

BRANDON SIMPSON, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: October 3, 2013

_____
*Judge's signature*

City and state: Sacramento, CA

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF ARREST WARRANT and CRIMINAL COMPLAINT

## I. INTRODUCTION

### A. Agent's Background and Experience

1.      I, Brandon Simpson, having been duly sworn, do hereby depose and state the following:

2.      I am a Special Agent with Federal Bureau of Investigation ("FBI"), presently assigned to the Sacramento Field Office.  I have been employed as a Special Agent since November 2004.  In the course of my employment with the FBI, I have conducted or been involved in more than 100 investigations of alleged criminal violations, which have included:  money laundering (18 U.S.C. §§ 1956, 1957); identity fraud (18 U.S.C. § 1028); structuring cash transactions (31 U.S.C. § 5324); mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); false statements in connection with loan applications (18 U.S.C. § 1014); witness tampering (18 U.S.C. § 1512); distributing controlled substances (21 U.S.C. § 841(a)(1)); making a false statement (18 U.S.C. § 1001); criminal conspiracy (18 U.S.C. §§ 371, 1349) and forfeiture (18 U.S.C. §§ 981, 982).  To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance and various types of infiltration, including undercover agents, informants and cooperating sources.  Most of these investigations focused on individuals deriving property from illegal activity.

3.      I have attended more than 1,000 hours of training in various aspects of criminal investigation, and I have attended classes and seminars dealing specifically with financial investigative techniques.

4.      I base this affidavit on my training and experience, my own investigation and on findings provided to me by FBI Special Agent Jonathan Fairbanks and Internal Revenue Service - Criminal Investigation ("IRS CI") Special Agent Christopher S. Fitzpatrick, among other law enforcement personnel, records obtained, and witness interviews.  I have not included every fact known to me regarding this investigation.  Rather, only those facts necessary to establish probable cause are included in this affidavit.

B. **Charge**

5.      I make this Affidavit in support of a Criminal Complaint and Arrest Warrant for ANDRES GIRALDO.  The information below establishes probable cause to believe that:

Beginning at a date unknown to the Grand Jury but no later than in or about February 2011 and continuing to the present, in the Eastern District of California and elsewhere, Andres GIRALDO, Ellen MELICIO[1], Wladimir ROCHA,[2] Joseph NKUNZI (indicted in the Eastern District of California on August 15, 2013 for his role in this scheme), and Safia AHMED (also indicted in the Eastern District of California on August 15, 2013 for her role in this scheme), and others knowingly combined, conspired, confederated and agreed with each other and with others to execute through the use of the mail a material scheme and artifice to defraud, and to obtain money by means of material false and fraudulent pretenses, representations and promises, and the concealment of material facts, in violation of Title 18, United States Code, Section 1349.

## II. SUMMARY OF PROBABLE CAUSE

6.      Joseph NKUNZI and Safia AHMED have been indicted for Conspiracy to Commit Mail Fraud, Mail Fraud, and Aggravated Identity Theft in United States v. Nkunzi, 2:13-cr-272 KJM.  The scheme described in that indictment is ongoing, perpetrated by individuals both known and unknown to law enforcement.  As set forth in this affidavit, there is probable cause to believe that GIRALDO is part of the same scheme and conspiracy.

7.      There is probable cause to believe that GIRALDO is engaged in a scheme to defraud elderly individuals across the United States.  Some of these elderly victims

_____

[1]  On September 26, 2013, the Honorable Carolyn Delany signed an arrest warrant and criminal complaint charging Ellen MELICIO with violating of Title, 18 United States Code, Section 1349 (Insert case number 2:13-MJ-287).

[2]  On September 13, 2013, the Honorable Allison Claire signed an arrest warrant and criminal complaint charging Wladimir ROCHA with violating of Title, 18 United States Code, Section 1349 (Insert case number 2:13-MJ-287).

2

reside in the State and Eastern District of California. As set forth in more detail below, GIRALDO and his associates are working with other individuals who are referred to herein as "COCONSPIRATOR #1," "COCONSPIRATOR #2," "COCONSPIRATOR #3," and COCONSPIRATOR #4". COCONSPIRATOR #1 and COCONSPIRATOR #2 contact the victims telephonically and falsely tell them that they have won a multi-million dollar lottery or sweepstakes prize. COCONSPIRATOR #1 and COCONSPIRATOR #2 communicate with the victims by telephone, email and/or fax, telling them that in order to collect their lottery winnings, they need to pre-pay the taxes on the prize money and/or pay for insurance on the lottery winnings prior to the money being transferred to them. COCONSPIRATOR #1 and COCONSPIRATOR #2 then direct the victims to mail and/or wire money to Post Office Boxes, commercial mailboxes, and/or accounts controlled by ROCHA and/or his associates. COCONSPIRATOR #3 directed ROCHA regarding the distribution of the fraud proceeds. COCONSPIRATOR #3 and COCONSPIRATOR #4 directed MELICIO regarding the further distribution of the fraud proceeds. I have listened to telephone calls between some of the victims and the individuals identified herein as COCONSPIRATOR #1 and COCONSPIRATOR #2. I am familiar with their voices, as are the victims with whom they have been in communication.

8.      Since the arrest of NKUNZI and AHMED, the manner in which the scheme is executed has changed slightly. The individuals identified herein as COCONSPIRATOR #1 and COCONSPIRATOR #2 tell previously contacted victims that they still need to pay additional taxes before they can receive their prize money. COCONSPIRATOR #1 and/or COCONSPIRATOR #2 tell the victims that they can help the victims find investors to make the tax payments for them. They say that in order to receive the investor money, the victims need to open up a new P.O. Box and/or a new bank account. They then say that they will contact the victims as soon as they find an investor. They then get another victim to mail the first victim a check. The first victim receives the check and sends the money along to a third party, such as ROCHA, as directed by COCONSPIRATOR #1 and/or COCONSPIRATOR #2.

9.      As described in the Criminal Complaint signed on September 13, 2013, ROCHA rented Post Office Box #22, in White Post, Virginia (hereinafter "White Post") on August 15, 2013 and commercial mailbox #248 at the UPS Store located at 4 Weems Lane, Winchester, Virginia (hereinafter "Winchester") on September 3, 2013. After opening these mailboxes, the following victim payments were directed by COCONSPIRATOR #1

3

and/or COCONSPIRATOR #2 to ROCHA and/or his associates:

a. On or around August 28, 2013, COCONSPIRATOR #1 and/or COCONSPIRATOR #2, directed victim K.R. to send a check for $34,050 to the White Post address (Note: NKUNZI, using the alias "Steve Williams," previously received $49,500 from the same K.R. at the direction of the same COCONSPIRATOR #1 and/or COCONSPIRATOR #2 identified above.).

b.      On September 3, 2013, victim K.R. was directed by COCONSPIRATOR #1 and/or COCONSPIRATOR #2 to send a check for $34,050 to the Winchester address identified above.

c.      On September 11, 2013, victim P.G. was directed to mail two checks, for $34,000 each to the Winchester address (Note: NKUNZI, using the alias "Steve Williams," received $49,750 from the same P.G. at the direction of the same COCONSPIRATOR #1 and/or COCONSPIRATOR #2 identified above.).

d.      On September 11, 2013, COCONSPIRATOR #1 and/or COCONSPIRATOR #2 directed victim K.R. to mail two checks, one for $34,000 and one for $33,000 to the Winchester address.

10.     As detailed further below, there is probable cause to believe that GIRALDO and/or her coconspirators caused letters to be sent from the Eastern District of California to other federal districts, including the Western District of Virginia and the Western District of Washington.  For example, on September 11, 2013, victim P.G. mailed two checks (identified above) from the Eastern District of California to the Winchester address, located in the Western District of Virginia.  A review of the bank records obtained in this investigation, in conjunction with interviews conducted by investigators, show that in or about May or June 2013, checks were sent from victims S.S. and B.K., both residing in the Eastern District of California to "Steve Williams" in the Western District of Washington.  The same coconspirators, COCONSPIRATOR #1 and/or COCONSPIRATOR #2 as identified above, who are currently directing victims K.R. and P.G. to mail checks to the White Post and/or Winchester addresses, also directed checks to be sent by S.S. and B.K.  Furthermore, the checks from S.S. and B.K. were deposited into the "Steve Williams" bank account controlled by NKUNZI, which is the same account into which checks from K.R. and P.G. were deposited.

4

///

///

## III. DETAILS OF INVESTIGATION

### A. Victim Interviews

11.     Victim B.K., a resident of the Eastern District of California, recalled that a person whom she believed to be COCONSPIRATOR #1 first contacted her regarding a lottery sweepstakes in approximately April 2013. COCONSPIRATOR #1 told B.K. the lottery was sponsored by large companies, including Coca-Cola. COCONSPIRATOR #1 called B.K. back within a week and said she had won the second place lottery prize, worth more than $1 million dollars. COCONSPIRATOR #1 told B.K. she was required to sign a confidentiality agreement. After B.K. received the confidentiality agreement, COCONSPIRATOR #1 began asking B.K. for money to "bond" and "insure" her lottery winnings.

12.     B.K. recalled that she mailed checks made out to "Steve Williams" at COCONSPIRATOR #1's direction from the Eastern District of California to an address in Washington. B.K. was given a couple of different dates as to when the lottery winnings would be sent to her, including a date at the end of May 2013, but the money never arrived. B.K. recalled that a person whom she believed to be COCONSPIRATOR #2 from the lottery company went "ballistic" after learning B.K. had told her son about the lottery and breached the confidentiality agreement.

13.     B.K. provided investigators a receipt showing that she shipped a package to "Elaine Edward," 1402 Auburn Way, N Ste. 344, Auburn, Washington from "The UPS Store" #1452, Stockton, CA 95207 on June 3, 2013 (Note: "Alain Edward" is a known alias of NKUNZI and commercial mailbox #344 at the UPS Store was opened with a California Driver's License with a photograph of NKUNZI. The checks mailed by B.K. make up part of the offense conduct set forth in the indictment in United States v. Nkunzi, 2:13-cr-272 KJM).

14.     Also, in approximately April 2013, victim S.S., a resident of the Eastern District of California, received a phone call notifying her that she was a finalist in a multi-million

dollar sweepstakes. A short time later, S.S. received another phone call from a person believed to be COCONSPIRATOR #2, who told her that she won approximately $4 million dollars. S.S. was told that the sweepstakes was sponsored by General Motors and an insurance company. Regarding the sweepstakes, S.S. only spoke to COCONSPIRATOR #1 and COCONSPIRATOR #2, who told her that in order to claim her prize she had to pay insurance and taxes up front. In all, S.S. wrote three checks, one for $3,250 (Insurance), one for $23,500 (Federal Taxes), and one for $17,250 (State Taxes). The checks were mailed from the Eastern District of California to "Steve Williams" at 1402 Auburn Way N., Ste 344, Auburn, Washington. COCONSPIRATOR #1 and/or COCONSPIRATOR #2 told S.S. that Williams was handling the taxes. S.S. was advised of a confidentiality agreement by COCONSPIRATOR #1 and/or COCONSPIRATOR #2. S.S. received documentation from COCONSPIRATOR #1 and/or COCONSPIRATOR #2 that appeared to legitimize the sweepstakes. One document was purportedly from Allstate insurance company, claiming to insure S.S.'s winnings. S.S. received other tax-related documents that appeared to be legitimate. S.S. never received any prize money.

15. Victim K.R. recalled that earlier this year she received calls from individuals she believed to be COCONSPIRATOR #1 and COCONSPIRATOR #2 regarding a lottery sweepstakes that she had won or was a finalist for winning. K.R. said she mailed a check for $4,250 and another check for $28,000 for taxes on her lottery winnings. K.R.'s son provided investigators with handwritten notes from K.R. with the names "Steve Williams" and "Alain Edward" and the 1402 Auburn Way. Ste. 344, Auburn, WA address. Bank records show that checks from K.R. were deposited into the "Steve Williams" bank account on March 1, 2013 ($4,250), April 18, 2013 ($28,000), and June 11, 2013 ($17,250).

16. On or about August 5, 2013, K.R. was directed by COCONSPIRATOR #1 and/or COCONSPIRATOR #2 to open a commercial mailbox. On or about August 15, 2013, COCONSPIRATOR #1 and/or COCONSPIRATOR #2 told K.R. that a check would be coming to her on August 16, 2013 from an "investor" who was advancing her money to help pay taxes to her lottery winnings. On August 19, 2013, K.R. was told by COCONSPIRATOR #1 and/or COCONSPIRATOR #2 that she would need to open a bank account to deposit this check.

17. On August 19, 2013, K.R.'s son provided investigators copies of two checks

6

received at K.R.'s new commercial mailbox opened at the direction of COCONSPIRATOR #1 and/or COCONSPIRATOR #2. These checks, each for $68,450 (total amount $136,900), were from J.C., another victim of the lottery scam. (A review of toll records related to a telephone number used by COCONSPIRATOR #1 and COCONSPIRATOR #2, held in the name of CONCONSPIRATOR #1, revealed at least fifteen calls from J.C.'s telephone to that number.)

18. On August 22, 2013, K.R. notified COCONSPIRATOR #1 and/or COCONSPIRATOR #2 that the funds had been deposited into her bank account. On or about August 28, 2013, K.R. received a call from COCONSPIRATOR #1 directing her to send checks to the White Post address and to victim P.G. COCONSPIRATOR #1 told K.R. that she would receive a fax at the FedEx store where she had recently opened a commercial mailbox. The fax sent to K.R. directed her to send a check for $34,050 to the White Post address and another check for $33,950 to victim P.G..

19. Investigators provided K.R. with two tracking numbers for the checks she was directed to send to these addresses. She in turn provided COCONSPIRATOR #1 with those tracking numbers. The tracking number for the envelope addressed to the White Post address showed that the package arrived on August 30, 2013.

20. Also on September 3, 2013, K.R. received another fax at the FedEx store where she had opened a mailbox. The fax directed K.R. to send a $34,050 check to the Winchester address and a $33,950 check to victim P.G. The fax indicated that the payments needed to be completed by September 4th, because the lottery officials would be arriving at K.R.'s residence on September 14th, between 1:00 and 3:00 PM.

21. Investigators again provided K.R. with two tracking numbers, that she in turn provided to CONCONSPIRATOR #1, for the envelopes she mailed to victim P.G. and the Winchester address.

22. During interviews with investigators, victim P.G. said that she received a call from COCONSPIRATOR #2 on June 2, 2013 advising her that she had won a lottery. COCONSPIRATOR #2 said the lottery was funded by Coca-Cola and General Motors. P.G. was told she won $7.4 million dollars and that she not tell anyone about it. P.G. was later told she needed to send a check for insurance and started receiving calls from COCONSPIRATOR #1 for tax payments. A review of the bank account records in the

7

name of "Steve Williams" revealed the Williams' account received the following checks from P.G.: $3,250 on or about July 3, 2013; $19,250 on or about July 10, 2013; and $27,250 on or about July 23, 2013. (As noted, the "Steve Williams" account was opened by indicted co-conspirator Joseph NKUNZI.) At one point, COCONSPIRATOR #1 and/or COCONSPIRATOR #2 told P.G. they were coming on a Friday to deliver her lottery winnings, but they never arrived.

23.     On or about August 14, 2013, COCONSPIRATOR #1 and/or COCONSPIRATOR #2 directed P.G. to open a P.O. Box. On or about August 16, 2013, a P.O. Box was opened for P.G. in Berkeley, California. She subsequently gave the P.O. Box number to COCONSPIRATOR #1 and/or COCONSPIRATOR #2. On August 30, 2013, COCONSPIRATOR #1 contacted P.G. and told her that an envelope with a $34,000 check should arrive at her new P.O. Box on this day or the following day. COCONSPIRATOR #1 told P.G. he would call her back in the evening when he was sure the package had arrived. COCONSPIRATOR #1 told P.G. she would need to deposit the money in her bank account and that he would direct her where to send the money after she deposited it.

24.     On September 3, 2013, P.G. received a call from COCONSPIRATOR #2 requesting that she pick up the check she received from K.R. and deposit it into P.G.'s bank account. P.G. was told that the checks she was receiving at the P.O. Box were from "investors" whom she could pay back after she received her lottery winnings.

25.     On or about September 6, 2013, P.G. received a call from COCONSPIRATOR #1 and/or COCONSPIRATOR #2 requesting that she pick up the second check that she received from K.R. and deposit the check into P.G.'s bank account.

26.     On or about September 9, 2013, COCONSPIRATOR #1 and/or COCONSPIRATOR #2 directed P.G. to mail checks to the Winchester address. On September 11, 2013, P.G. mailed checks from the Eastern District of California to the Winchester address.

27.     On September 11, 2013, investigators interviewed UPS Store employee L.Z. regarding commercial mailbox #248 (the Winchester mailbox) and ROCHA. According to L.Z., at approximately 5:50 pm (Eastern Standard Time), ROCHA arrived at the Winchester mailbox location and retrieved the package sent by victim K.R., which

8

contained a $34,050 check.

28.    On September 12, 2013, investigators observed ROCHA arrive at the Winchester mailbox location and pick up the package sent by victim P.G. from the Eastern District of California. This package contained two separate $34,000 checks.[3] The checks were mailed to ROCHA's commercial mailbox by victim P.G. at the direction of COCONSPIRATOR #1.

29.    On or about September 3, 2013, victim B.M., a resident of the Eastern District of California, received a call regarding being the finalist in a lottery sweepstakes. The caller identified himself as R.W., a name previously used as part of this scheme with both victim K.R. and victim P.G. in faxes sent to those victims. The investigation to date shows that R.W. is likely the same person as COCONSPIRATOR #2 (R.W. is referred to as COCONSPIRATOR #2 hereinafter). COCONSPIRATOR #2 told B.M. that the lottery was sponsored by such companies as Coca-Cola and General Motors. Sometime after COCONSPIRATOR #2 told B.M. that she was one of three finalists, CONCONSPIRATOR #2 called B.M. and told her that she had won approximately $3.7 million. After B.M. received a confidentiality agreement, COCONSPIRATOR #2 began asking her for money to insure her lottery winnings. At the direction of COCONSPIRATOR #2 and, in order to pay for insurance on her lottery winnings, victim B.M. made a check payable to victim W.B. for approximately $3,250 and mailed the check to W.B. on or around September 3, 2013. (B.M. was told that W.B. was a broker for the insurance that B.M. was directed to pay in connection with the lottery. W.B. is, in fact, another victim.) On or around September 4, 2013, victim W.B. received the check from victim B.M.

30.    On or about September 13, 2013 and, in order to pay taxes on her lottery winnings, victim B.M. was directed by COCONSPIRATOR #2 to send a check for $17,000 to the Winchester address. On September 16, 2013, victim B.M. received a call from a person using the same first name as COCONSPIRATOR #1, and believed by investigators to be COCONSPIRATOR #1 (hereinafter referred to as COCONSPIRATOR #1). COCONSPIRATOR #1 spoke with victim B.M. about mailing the check to the Winchester address. Shortly after the conversation with COCONSPIRATOR #1, victim B.M. wrote a check and addressed a UPS envelope per

---

[3] Measures were taken so that the funds from the checks would not be released.

the instructions she was provided by COCONSPIRATOR #1 and/or COCONSPIRATOR #2. This check was mailed from the Eastern District of California to the Winchester address.

### B.    ROCHA's Arrest

31.    On September 17, 2013, ROCHA was arrested for his role in the fraud scheme described herein. After being advised of his *Miranda* rights, ROCHA told investigators that COCONSPIRATOR #3 directed him regarding the opening of mailboxes, the receipt of payments, and distribution of the funds he received as part of the scheme. At the request of investigators, ROCHA agreed to send text messages and make phone calls to COCONSPIRATOR #3 regarding the fraud proceeds that had been mailed to the mailboxes ROCHA recently opened.

32.    On September 18, 2013, ROCHA made a call to COCONSPIRATOR #3. COCONSPIRATOR #3 told ROCHA to withdraw $30,600 in cash from an account holding the fraud proceeds. COCONSPIRATOR #3 said that MELICIO would meet ROCHA and take the money. MELICIO was then supposed to take the cash to New York. COCONSPIRATOR #3 did not discuss who MELICIO was going to meet in New York.

33.    On September 19, 2013, ROCHA made a recorded call to COCONSPIRATOR #3. ROCHA told COCONSPIRATOR #3 that he had the cash that COCONSPIRATOR #3 had directed him to withdraw. COCONSPIRATOR #3 told ROCHA to send $3,000 to Colombia via Western Union (Note: COCONSPIRATOR #3 was going to text the Western Union information to ROCHA at a later time). COCONSPIRATOR #3 then said that he had spoken with MELICIO and that she was going to contact ROCHA to arrange a meeting so that she could take the remaining cash to New York.

34.    Between September 24, 2013 and September 26, 2013, an FBI Agent working in an undercover capacity (hereinafter "UCE 4545") participated in three consensually recorded telephone calls with MELICIO and arranged a meeting with MELICIO to deliver the remaining money to her.

10

## C.    MELICIO's Arrest

35.    On September 27, 2013, MELICIO was arrested for her role in the fraud scheme described herein. After being advised of her *Miranda* rights, MELICIO told investigators that COCONSPIRATOR #3 directed her regarding the receipt of money from ROCHA and further distribution of these funds. At the request of investigators, MELICIO agreed to participate in consensually monitored phone calls with COCONSPIRATOR #3 and COCONSPIRATOR #4.    During a recorded call between MELICIO and COCONSPIRATOR #4, MELICIO told COCONSPIRATOR #4 that she didn't know anything about the origin of the money she picked up and she was just told by COCONSPIRATOR #3 to pick up the money and COCONSPIRATOR #3 would come get it. In pertinent part, the following exchange then occurred:

MELICIO:  I don't know about anything, I was just told to grab the shit and give it, you know hold onto it and he was going to come get it, that's it.

COCONSPIRATOR #4: I, I really appreciate (interrupted)

MELICIO: I don't know what the hell this is. I just don't want to get myself into any shit, that's all.

COCONSPIRATOR #4: No, don't worry, don't worry. I give [COCONSPIRATOR #3] my word, that if anybody's going to go, it's gonna be like from my family, and go and get it from you.

MELICIO: Okay.

COCONSPIRATOR #4: And, um, the rest, whatever you keep whatever else your gonna give you, I just got to pay these people that's it, you know.

COCONSPIRATOR #4 also told MELICIO that COCONSPIRATOR #3 was going to provide her with a couple of names that she could use to make Western Union transfers to Colombia for COCONSPIRATOR #4's benefit. CONCONSPIRATOR #4 said that there was actually $122,000 available and that as long as COCONSPIRATOR #4 got the $98,000, MELICIO and COCONSPIRATOR #3 could split the remaining "twenty something". After telling COCONSPIRATOR #4 that she wanted to get rid of

11

the money as soon as possible, CONSPIRATOR #4, in pertinent part, said:

COCONSPIRATOR #4: I gave [COCONSPIRATOR #3] my word it's not going to be anybody else except my people, my family that's gonna go pick it up from you, so don't worry about it. You know, don't, don't panic or anything cause now I feel much at ease that it's in your hands.

36.    Between September 28, 2013 and October 1, 2013, an FBI Agent working in an undercover capacity (hereinafter "UCE 4545") participated in consensually recorded telephone calls and text message communications with COCONSPIRATOR #4. During these communications between UCE 4545 and COCONSPIRATOR #4, in pertinent part, *cu* the following text messages were sent by COCONSPIRATOR #4 ~~regarding the~~ *to arrange for* Andres GIRALDO ~~scheduled~~ to collect the fraud proceeds on COCONSPIRATOR #4's behalf:

COCONSPIRATOR #4:
Text #1 - 9:52AM "What is a good time for u to give that? I have a cousin that is willing to get that from u today latest tm.what times are good for u?

Text #2- 9:53AM "I know its chantilly, VA ......Can u give me a more specific area ? Like a mall or a restaurant?"

Text #3 - 9:56AM "Or do you mind if he goes to your house? Whatever suits you best!"

Text #4 - 9:57AM "Whatever you feel most confortable with....."

Text#5 - 10:00AM "He's my cousin, so all good! Don't worry! Grew up with the guy like a brother!"

37.    COCONSPIRATOR #4 sent a text on 10/2 reading "Here's pedros # 4076875660 he's trying to call u .... But ur not piking up so please call him when u have a chance....!"

*, later identified as Andres Giraldo.*

38.    The UC then called the number 407-687-5660 and the person who answered identified himself as "Pedro". UCE 4545 and Pedro discussed that they were going to attempt to meet at 11 am on the following day and Pedro said "The only thing is I'm probably going to need a wire transfer just because I don't really have cash to get up there." Pedro then said he needed $1,000 and said "I'm going to have to call

12

[COCONSPIRATOR #4] then and talk to him."

39.    On October 3, 2013, GIRALDO appeared at the scheduled meet location to collect money on behalf of Coconspirator # 4, approximately $43,000. determined by the UCE. At the time he was approached by agents, he was on the phone with the UCE.  The phone he was on was the same one he had used to speak with the UCE the day prior.



## IV.  CONCLUSION

39.    Based on the investigation to date and my training and experience, I have probable cause to believe that Andres GIRALDO and others have conspired to commit mail fraud, in violation of Title 18, United States Code, Section 1349.  I therefore respectfully request a warrant for the arrest of Andres GIRALDO for these criminal violations.

## V.  REQUEST FOR SEALING ORDER

40.    Because this investigation is ongoing, disclosure of the contents of this affidavit will jeopardize the progress of the investigation.  Accordingly, I request that the Court issue an order pursuant to which the Criminal Complaint, the Arrest Warrant, and this Affidavit be filed under seal until further order of this Court.

Brandon Simpson
Special Agent, FBI

Reviewed and approved as to form

R. Steven Lapham
Assistant United States Attorney

Subscribed and sworn to before me
this 3 day of October, 2013.

Hon. Carolyn K. Delaney
United States Magistrate Judge

13